UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | : | |
| RAYMOND J. PARDO, | : | Civil Action No.: |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | **VERIFIED COMPLAINT** |
| | : | |
| KIRSTJEN NIELSEN, Secretary, | : | |
| Department of Homeland Security, | : | |
| | : | |
| *Defendant.* | : | Trial by Jury |
| | : | |

Plaintiff, Raymond J. Pardo, by and through his attorneys, Wolin & Wolin, complaining

of the defendant, Kirstjen Nielsen, Secretary, Department of Homeland Security, alleges as

follows:

### Introduction

1.      This is an action brought pursuant to 5 U.S.C. § 7703(b)(2),  Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended, more specifically 42 U.S.C. § 2000e-5

and 42 U.S.C. § 2000e-16, and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*.  Plaintiff

alleges that the determination of the Department of Homeland Security ("DHS"), as affirmed

by the Merit Systems Protection Board ("MSPB") in a  "mixed case appeal," which resulted in

plaintiff's termination as a Customs and Border Protection Officer ("CBPO") (Program

Manager), was arbitrary, capricious, obtained without compliance with lawful procedures,

unsupported by substantial evidence and otherwise not in accordance with law.  Plaintiff also

alleges that his termination does not promote the efficiency of the service and the penalty of

removal exceeded the bounds of reasonableness.  Plaintiff also alleges that, in terminating his

employment, defendant retaliated against him because he had engaged in protected EEO activity, failed to reasonably accommodate his disability, and otherwise engaged in disability discrimination. Plaintiff seeks appropriate monetary, equitable and other relief to redress the wrongdoing complained of herein.

## Statement Pursuant to Local Rule 9

2.      For purposes of complying with Local Rule 9, Plaintiff states that he has no corporate parent, subsidiary or affiliate and that there are no other interested parties.

## Jurisdiction and Venue

3.      Jurisdiction of the Court over this controversy is based upon 5 U.S.C. § 7703(b)(2), 42 U.S.C. § 2000e-5(f) and 42 U.S.C. § 2000e-16.

4.      Venue is proper in this District pursuant to 42 U.S.C. § 2000e-5(f)(3).

## Parties

5.      Plaintiff was and still is a citizen of the United States of America and, at all relevant times, was and still is a resident of the State of New Jersey.

6.      Defendant Kirstjen Nielsen, is the duly appointed and sworn Secretary of DHS and is that agency head, under 42 U.S.C. § 2000e-16, who is the appropriate defendant herein.

## Exhaustion of Administrative Remedies

7.      On June 14, 2016, defendant issued a letter to plaintiff proposing to remove him from his position as a CBPO (Program Manager), GS-1895-13. In said letter, Richard DiNucci, Acting Port Director, claimed that the removal was proposed "for non-disciplinary reasons, in order to promote the efficiency of CBP." More specifically, the proposal letter stated that it was based on "your unavailability for duty." Mr. DiNucci noted that Plaintiff had "sustained an on

the job injury that caused bilateral rotator cuff and bicep tears" and that Plaintiff had "not reported to work since January 24, 2012, due to [his] injuries."

8.      Plaintiff replied to the proposal letter by letters dated July 23, 2016 and August 8, 2016.  In his replies, plaintiff noted that defendant had violated CBP Directive No. 51810-008, which states, at Section 1.1, "The purpose of this directive is to set forth provisions and establish procedures for the administration of the U.S. Department of Labor's ("DOL"), Office of Workers' Compensation Programs ("OWCP") return to work ("RTW") process with the U.S. Customs and Border Protection."  Plaintiff also claimed that the proposal contained "numerous inaccuracies, half truths and lies."

9.      In a letter dated February 13, 2017, Robert E. Perez, Director, Field Operations, New York Field Office, sustained plaintiff's removal.  DFO Perez wrote that "It is my decision that your removal for non-disciplinary reasons is warranted and will promote the efficiency of the service."

10.      On October 5, 2017, plaintiff timely re-filed an appeal with the Merit Systems Protection Board ("MSPB") challenging defendant's decision to remove him, effective February 17, 2017, from his position as a CBPO (Program Manager), GS-1895-13, with defendant's U.S. Customs and Border Protection ("CBP").

11.      In his appeal, plaintiff made various arguments, including the assertion that his termination was in violation of 42 U.S.C. 2000e, *et seq.* and 29 U.S.C. § 701 *et seq.*, in that defendant retaliated against him on account of his previous EEO activity, failed to reasonably accommodate his disability, and did otherwise engage in disability discrimination.

12.      The MSPB considered plaintiff's appeal to be a "mixed case."

13.     The MSPB had jurisdiction over plaintiff's appeal pursuant to 5 U.S.C. § 7511(a)(1)(A), 7512(1), and 7701.

14.     Plaintiff requested and received a hearing before an Administrative Judge of the MSPB, which was held on May 4, 2018 and July 25, 2018.  A verbatim transcript of the hearing was made.  During the hearing, each side presented testimony and introduced evidence.

15.     In an Initial Decision dated November 21, 2018, the MSPB Administrative Judge affirmed defendant's removal action.  In so doing, she rejected all of the arguments that plaintiff made in support of his appeal, including, but not limited to (1) defendant's action was not supported by the requisite degree of evidence; (2) defendant retaliated against plaintiff for having engaged in protected EEO activity; (3) defendant did not reasonably accommodate plaintiff's disability and did otherwise engage in disability discrimination; (4) defendant committed harmful procedural error; (5) defendant did not prove that there was a nexus between the charged misconduct and the promotion of the efficiency of the service; (6) defendant did not prove that the penalty of termination was reasonable; (7) defendant did not make a good faith effort to find plaintiff a suitable position that he could perform; (8) defendant did not properly assess plaintiff's ability to perform duties in other capacities; and (9) plaintiff had not reached maximum medical improvement (MMI).

16.     The Initial Decision stated that it would become final on December 26, 2018, unless a Petition for Review was filed by that date.  A Petition for Review was not filed.

17.     The Initial Decision further stated that, pursuant to 5 U.S.C. § 7703(b)(2), plaintiff could file a civil action in an appropriate United States District Court, on both his discrimination claim and other claims, within 30 calendar days after the date on which the

Initial Decision became final.

18.     This action is being filed within 30 calendar days after the date on which the

Initial Decision became final and, thus, plaintiff has exhausted his administrative remedies.

### Facts

19.     Plaintiff became employed by the U.S. Customs Service on October 30, 1984. His

job title was Inspector.  In or about 1989, Plaintiff became a Senior Inspector and then became

a Senior Inspector/Special Inspector.  He was promoted to a GS-12 in 1996.

20.     Upon the creation of the DHS and CBP, Plaintiff's job title was changed to CBPO.

In that job title, Plaintiff was a Program Manager/Special Inspections.   As a Program

Manager/Special Inspections, Plaintiff had the responsibility of performing examinations that

would ordinarily be difficult to examine or which required some sort of technical expertise.

During his employment, Plaintiff was assigned to the Port of Newark, New Jersey, New York

Field Office.  He remained employed by CBP until his removal in February 2017.

**A.      Plaintiff's Medical Conditions and Injuries and**
**Prior Requests for Reasonable Accommodation**

21.     Plaintiff was diagnosed with Hodgkins Lymphoma in 1978 at the age of 25.  He

was diagnosed with skin cancer in 1996, which was a side effect of the radiation treatment that

he had received for the Hodgkins Lymphoma.  As a result, Plaintiff has had to have skin cancer

cells surgically removed on a periodic basis.

22.     Complicating matters was the fact that Plaintiff was born with a facial mole on

his right jaw, which became inflamed and bled after shaving.  As a result, Plaintiff grew a beard

in 1969 and had a beard when he became employed by the U.S. Customs Service.  However, in

2004, CBP instituted a policy of no facial hair.  The policy provided that a waiver could be

requested for "medical, religious or cultural reasons."

23.     Plaintiff shaved his beard to comply with the new grooming policy.  After he removed the beard, the mole became inflamed again and started bleeding and became generally irritated.  Plaintiff's physician advised against removing the mole. The physician recommended that Plaintiff should regrow his beard.  Therefore, Plaintiff applied for a waiver. In April 2005, the Agency granted an exemption to Plaintiff and he was permitted to wear a beard within guidelines.

24.     These conditions and their effects are disabilities under relevant statute. Plaintiff had to grow a beard because of his history of cancer, not simply because he had a mole.  Plaintiff's request for an exemption to the facial hair policy was a request for a reasonable accommodation and was, in fact, routed to CBP Headquarters-EEO for review and recommendation.

25.     In 2006, CBP decided to utilize Plaintiff in training videos to document his search and seizure tools and techniques.  Plaintiff filmed the video during which he had a beard. Plaintiff filmed the video in the Summer of 2006 and it was released in or about October 2006. Plaintiff's participation in the video is reflected in a letter from Royce G. Walters, Acting Division Director, Anti-Terrorism Training Division dated February 26, 2016 – before the video was filmed and released.  Mr. Walters wrote "I would like to thank you for providing subject matter expertise around both seals and containment methods for the development of videos on these subjects.  Your experience, knowledge, expertise and ingenuity are renowned throughout Customs and Border Protection (CBP) and your participation in these videos will ensure their success."

26.     Shortly after the video was released, CBP's attitude suddenly changed.  Shortly after the video was released, Mr. Walters told Plaintiff "I just wanted to you know that you caused a big problem in Headquarters, having that beard on the video."  Mr. Walters was very irate.  Plaintiff responded that he had a medical exemption.  Mr. Walters responded "What are we supposed to tell new recruits when they see you with a beard?"  Mr. Walters asked Plaintiff why he could not shave for the video.

27.     These said comments, contrary to the MSPB's decision, constituted direct evidence of discriminatory animus.

28.     As time progressed, it became clear to Plaintiff that CBP viewed the beard negatively.  CBP suppressed the video.  It began taking actions against Plaintiff because he had the beard, which resulted from his disability and the resultant reasonable accommodation request.  This led to a series of retaliatory actions against Plaintiff which created a hostile work environment and which culminated in his removal.  The MSPB failed to look at the totality of the circumstances and that Plaintiff encountered over a decade long hostile work environment which culminated in his removal.  Many of these actions were the subject of EEO complaints which preceded Plaintiff's removal.

29.     Plaintiff's removal is related to the issues of the disability, the beard and the video.  The retaliatory animus that CBP displayed in reaction to the beard and video continued even after Plaintiff's removal, as evidenced in his sixth and seventh EEO complaints – Agency Case Nos. HS-CBP-02193-2018 and HS-CBP-01558-2018.

30.     The CBP facial hair policy, which was in effect at the time of Plaintiff's injury, was the same policy which was in effect when Plaintiff was granted his medical exemption to CBP

facial hair standards.  Any CBP manager would recognize Plaintiff as an employee who had requested a reasonable accommodation to grow facial hair.

31.     On November 14, 2011, at the age of 59, Plaintiff sustained an on the job injury, which resulted in his tearing both rotator cuffs and biceps.  At the time, he fell off a ladder.

32.     Prior to this injury, Plaintiff attempted, on at least four (4) occasions, to be assigned to new intelligence positions.  CBP unreasonably denied Plaintiff's requests.  As a result, Plaintiff had to continue working strenuous assignment in the field, which contributed to his injury and which constituted additional discriminatory and retaliatory animus.

33.     Plaintiff requested these said positions when he turned 55 because he realized that his physical capabilities were starting to wane.  At the time, when Plaintiff's requests were denied, he was told by Chief Kevin McCabe that CBP was looking for younger officers.  Plaintiff believed that his request to be reassigned to one of the intelligence positions was also a request for a reasonable accommodation because of his limiting physical abilities and directly related to his disabilities.  Others were permitted to move into less strenuous positions.

34.     Plaintiff sought medical attention because of the injury on November 16, 2011.  He continued to work and was placed on modified duty until January 24, 2012.  Plaintiff was placed on a restriction of no lifting or pushing over fifteen (15) pounds.

35.     On January 25, 2012, Plaintiff underwent surgery in an attempt to correct the injury and used a combination of sick leave and annual leave from January 25, 2012 through December 2, 2012.  The surgery was performed by Neil Roth, M.D.   In his Operative Report, Dr. Roth described Plaintiff's diagnoses as "right shoulder full thickness rotator cuff tear, right shoulder biceps tendinitis, right shoulder superior labial tear, right shoulder glenohumeral

joint arthritis." After January 24, 2012, Plaintiff never again reported for work.

36.     Plaintiff applied for workers' compensation benefits through the Office of Workers' Compensation Programs ("OWCP"). The application was accepted and Plaintiff began receiving benefits on March 29, 2013, when he received benefits for the period of January 12, 2013 to March 8, 2013. Plaintiff did not receive benefits for the period of December 3, 2012 through December 28, 2012 until two years later, on December 12, 2014, and he did not receive benefits for the period of December 29, 2012 to January 11, 2013 until over two and a half years later, on July 17, 2015. Plaintiff did not receive benefits for the period of May 26, 2014 to June 13, 2015, until July 10, 2015. Plaintiff went over a year without any compensation, causing him to lose his Federal Employees Health Benefits. Plaintiff continues to receive workers' compensation benefits. Meanwhile, CBP carried him in leave without pay ("LWP") status until his removal. Plaintiff's OWCP delayed compensation was a result of CBP's repeated failure to timely file Wage-Loss Compensation Form CA-7 with the DOL. This is in direct violation of CBP Directive No. 51810-008. Plaintiff's pay issues and related loss of health benefits were not resolved until Plaintiff sought the assistance of his Congressional representative.

37.     CBP was well aware of Plaintiff's disability. Plaintiff's disability of bilateral irreparable rotator cuff and biceps tears was well established by the medical evidence of record and was accepted as a compensable condition by OWCP. In fact, on May 14, 2014, Plaintiff attended an Independent Medical Examination (IME) ordered by CBP, where the attending physician, Howard Baruch, stated "At this time, the claimant is severely disabled."

38.     Plaintiff is a qualified individual with a disability who could have performed in

a suitable position with accommodation.

39.     CBP failed to fulfill the interactive process to find Plaintiff a suitable position, at a time when it should have.

**B.     CBP's Failure to Make Suitable and Good
         Faith Efforts to Return Plaintiff to Work**

40.     On December 5, 2012, Plaintiff consulted with Dr. Roth, who authorized Plaintiff to return to work with restrictions.  Dr. Roth provided Plaintiff with a return to work note on December 5, 2012.  Dr. Roth opined that Plaintiff could return to work on December 10, 2012 with restrictions of no lifting over two (2) pounds and no pushing and/or pulling over two (2) pounds for force and limited use of right hand.  On December 6, 2012, Plaintiff hand delivered Dr. Roth's note to Deputy Chief Rudolph Frank.  He also gave a copy to Michael Hegler, a CBP supervisor.  Deputy Chief Frank and Supervisor Hegler reacted favorably and told Plaintiff to return on December 10, 2012.

41.     Plaintiff's request to return was a request for a reasonable accommodation and a good faith effort to return to an available position within his restrictions.  CBP would have nothing of it and, instead, did not permit Plaintiff to return.  On December 7, 2012, Plaintiff sent Richard Jacobowitz, the Health and Safety Officer, an email advising him that he was authorized to return to work.  Rather than being receptive to Plaintiff's return, Mr. Jacobowitz acted confrontational and asked Plaintiff who authorized him to return and directed Plaintiff not to return until he discovered who authorized him to return.  He also asked DC Frank to "reach out" to him.  CBP, by this email chain, did not want Plaintiff back.

42.     Contrary to the MSPB's conclusion, Mr. Jacobowitz did not properly engage in the interactive process.  Plaintiff, contrary to the MSPB's conclusion, did respond to CBP's

request to determine whether he could perform the essential functions of any position.  All of the evidence that CBP relied upon was contained in the myriad of medical records which had already been provided to it.

43.     The MSPB was also wrong in asserting that Plaintiff "was not interested in returning to a non-law enforcement position."  Plaintiff never received any offer and did not reject any position for which he was medically qualified.

44.     CBP's actions, with reference to not permitting Plaintiff to return to work in December 2012, was the beginning of its persistent pattern of conduct, in which CBP displayed utter disregard of its very own return to work procedures, as contained in the CBP directive, including ensuring that Plaintiff first reached MMI.  It was also the beginning of CBP's total disregard to have Plaintiff return within the restrictions set forth by Plaintiff's medical professionals.

45.     CBP **never made one legitimate offer to Plaintiff** to secure his return to work. CBP's failure to follow its policies and procedures tainted the entire process and resulted in Plaintiff being removed prematurely and in disregard of procedure.  This was harmful procedural error.

46.     CBP's actions also totally ignored its continued obligation to reasonably accommodate Plaintiff.  CBP never made a good faith effort to find Plaintiff a suitable position.

47.     Plaintiff continued consulting with physicians concerning his injury.  The opinions of these physicians should have guided the restrictions under which Plaintiff could return to work.  At every step of the way CBP ignored the restrictions imposed by one physician after the other.  CBP did not display any good faith to fine a suitable position.

48.     In June 2013, Plaintiff consulted with Jeffrey Lakin, M.D.  He was a contract DOL second opinion doctor.   Dr. Lakin diagnosed Plaintiff with a bilateral rotator cuff and bicep tear.  He opined that Plaintiff had not reached MMI and gave Plaintiff a weight restriction of 10 pounds with reference to pushing, pulling, lifting, squatting and kneeling.   Dr. Lakin also stated that an expected date for full recover was undetermined as Plaintiff was still undergoing treatment.  MMI, according to the CBP directive, is a prerequisite before any job offer may be made.

49.     Plaintiff also consulted with Howard Baruch, M.D., a contract CBP physician who saw Plaintiff in June 2014.  Dr. Baruch opined that Plaintiff could not lift over 20 pounds and could not reach overhead for long periods.

50.     By this said time, almost three years after the November 2011 accident, CBP had still not made a return to work offer to Plaintiff.  Moreover, by this time, CBP had not engaged Plaintiff or any of the medical professionals in any dialogue or interactive process with regard to Plaintiff returning to work.

51.     As of September 2014, Plaintiff had still not received an invitation from CBP to return to work.  On or about September 6, 2014, Plaintiff received an options letter from Port Director (PD) Adele Fasano.   The options letter indicated, as a result of being found not fit for duty after the workplace injury, Plaintiff had the option of submitting an application for reassignment, resigning, retiring or he would be removed from service, if he made no selection.

52.     Plaintiff believed that the letter continued numerous factual inaccuracies. Plaintiff believed that CBP had done nothing, almost three years after the injury, to find a

suitable position and that he had not yet reached MMI.  Plaintiff believed CBP was setting him up to be removed.

53.     Upon receiving the letter, Plaintiff responded.  By letter dated September 13, 2014, Plaintiff advised PD Fasano of these said inaccuracies and stated that he would not respond to the options letter until the inaccuracies were corrected.  Plaintiff noted that he had not yet reached MMI.

54.     By letter dated October 17, 2014, Plaintiff again requested that the options letter be corrected and that his response time be extended until 15 days after receipt of the corrected options letter.  He indicated that the inaccuracies in the options letter had not been corrected.

55.     Plaintiff never received a response to this letter, including an alleged response from CBP dated November 5, 2014, wherein CBP allegedly maintained that there were no inaccuracies with regard to the prior letter and, again, requesting that Plaintiff choose an option.

56.     The MSPB was not persuaded by Plaintiff's claim that he did not receive the said November 5, 2014 letter; but CBP never provided any proof that Plaintiff received this letter.  Plaintiff had to sign for all previous letters and, presumably,  would have had to sign for this letter as well.  Plaintiff has consistently stated that he never received the November 5, 2014 letter.

57.     The options letter was procedurally improper because Plaintiff had not reached MMI and that was a prerequisite before he could be forced to choose an option.  Moreover, although CBP contends that Plaintiff did not respond to the options letter, the record indicates

that he did.

58.     Several more months passed without CBP making any effort to find Plaintiff a suitable position.  It was then, on or about March 4, 2015, that Plaintiff received a package, which included a purported "job offer" from CBP for the position of Import Specialist, GS-1889-11.

59.     The letter dated February 27, 2015 came from Rose Avila, Injury Compensation Specialist.  The letter advised Plaintiff of a "possible position available for you that may accommodate your permanent restrictions as indicated by your physician."  Enclosed was a position description that CBP believed will "accommodate your permanent medical restrictions as delineated by Howard Baruch, M.D.."  The letter requested Plaintiff's resume and made it clear that the Minneapolis Hiring Center would perform a "qualifications review to determine if you meet the basic level of this position."

60.     When he received said package, Plaintiff considered it to be an actual job offer, as evidenced by the fact that the first thing Plaintiff did when he received the letter was to send a copy to his attorney, Carolyn Uliase.  Ms. Uliase also considered it a job offer, as evidenced by her March 9, 2015 letter to Ms. Avila, wherein she stated "Please be advised that Mr. Pardo has forwarded me a copy of your February 27, 2015 correspondence, which contains a job offer.  I would note that the offer is not in compliance with FECA Procedures Manual, specifically Section 814.4.  Specifically, the offer does not include any pay information or the hours to be worked.  Also please be advised that the Claimant will be meeting with his treating physician to discuss whether he is capable of performing the physical requirements of the proposed job."

61.     At or about the same time, Donna Walker received a memo from Mr. Jacobowitz asking her to forward the "job offer" to the "DOL/Return to Work Team to see if this was a valid job offer for Mr. Pardo."

62.     The DOL never determined that this was a valid job offer or that it was suitable within Plaintiff's medical restrictions.

63.     This "attempt" by CBP to "offer" Plaintiff the position of Import Specialist was a sham and did not even constitute a valid job offer.   CBP never received the required clearance from the DOL or the Minneapolis Hiring Center, but the alleged "offer" was not consistent with Plaintiff's medical restrictions and ignored the fact that Plaintiff was restricted from climbing.   The position description for the Import Specialist position contains the physical demands of the position.   It states that "some walking, standing, lifting up to  30 pounds and climbing may be necessary."

64.     These said physical demands were not compatible with Plaintiff's restrictions, which were ignored by CBP in formulating the said "offer" and were not even compatible with Dr. Baruch's restrictions, upon which Ms. Avila claimed she relied.    Dr. Baruch, the CBP physician, opined that Plaintiff's lifting maximum was 20 pounds and he could not climb.   In fact, up to this point, no medical professional had opined that Plaintiff  could lift up to 30 pounds or that he could climb.   As a result, Plaintiff concluded, rightfully, that this so-called "offer" was not valid, either as a suitable position or as a reasonable accommodation.

65.     This said conclusion was validated by a November 17, 2015 CBP Medical Physician Review Report by Mark Hammett, M.D.   He also concluded that the Import Specialist position was not consistent with the physical restrictions recommended.   Dr. Hammett

continued "He is limited to lifting less than or equal to 20 lbs. for short periods of time and the notion of climbing (as in up a ladder) is beyond his described physical capabilities. Other than these two limitations, he would be capable of performing the job."

66.    On May 26, 2015, Timothy Henderson, M.D. also concluded that MMI had not be reached, that Plaintiff's lifting restriction was 5 lbs. and that these restrictions were permanent. Plaintiff was referred to Dr. Henderson by the DOL and his report effectively constituted the DOL's conclusion that the Import Specialist position was not compatible with Plaintiff's disability.

67.    There were even other reasons why this so-called "offer" was unreasonable. At the time, Plaintiff had not reached MMI.  The job offer was also two grades lower than Plaintiff's then present position and was substantially below his work experience, qualifications and knowledge.

68.    This was not a valid job offer and was discriminatory, retaliatory and was not a reasonable accommodation, in that CBP ignored all medical evidence.

69.    Ms. Avila's letter, which references Directive No. 51810-008 as support, was in direct violation of CBP Directive No. 51810-008, Section 9, which is entitled "Procedures for Permanent Reassignment."

70.    Plaintiff responded to PD Fasano's invalid offer.  He sent a letter to Ms. Avila dated March 16, 2015. Plaintiff stated that he could neither accept nor reject the job offer until he consulted with his physician.  Plaintiff, in showing the "job offer" to his physician, believed that he was acting pursuant to Ms. Avila's suggestion.

71.    Plaintiff also responded to PD Fasano's invalid job offer through his OWCP

attorney by letter dated March 9, 2015.   The attorney noted that the letter was not a valid job offer and that it did not comply with the Federal Employees' Compensation Act ("FECA").

72.     Thereupon, Plaintiff sent his resume and OF-612 to Ms. Avila, as per her February 27, 2015 letter.  He sent it to the address to which Ms. Avila had instructed him to send it in El Paso, Texas.  At the MSPB hearing, CBP witnesses questioned the fact that Plaintiff sent the resume and OF-612 to Texas.   Plaintiff sent the paperwork where he was instructed to.  Plaintiff did not mail the documents until April 20, 2015, because he was waiting until he consulted with his physician in order to obtain his insight, as he was encouraged to do by Ms. Avila.  In the end, Plaintiff was never actually offered the position of Import Specialist.

73.     At all times, Plaintiff  cooperated with Ms. Avila's request.  Plaintiff acted with all due diligence in soliciting the advice of his physician and in forwarding his resume and OF-612.

74.     The MSPB's conclusion that Plaintiff did not timely respond is incorrect, as is the conclusion that CBP used all available information in an effort to find Plaintiff a position that met his medical restrictions.  In the end, it was CBP who advised Plaintiff that the position of Import Specialist that was the subject of PD Fasano's "offer" was no longer available.

75.     The MSPB was also wrong in asserting that Plaintiff declined this "offer." Plaintiff was not medically qualified and there was no "offer" made in the first place.

76.     Several months went by and Plaintiff again heard nothing from CBP.  In June 2016, Plaintiff received the Notice of Proposed Removal.   Plaintiff received the Notice of Proposed Removal without ever having been offered a suitable position by CBP and without having reached MMI.  Other than the purported "offer" of Import Specialist, CBP had not

engaged Plaintiff in any effort to find him a suitable position. Plaintiff had never received nor rejected any actual job offer. Plaintiff's removal was premature.

77.    The facts in this case do not support the MSPB's conclusion that Plaintiff's argument that CBP failed to make a good faith effort to find him another position "lacks merit." The fact is that CBP never made Plaintiff a single job offer. The Administrative Judge's conclusion that CBP, not having Plaintiff's OF-612 and/or resume until April 2015, precluded it from making a good faith offer is not supportable. CBP had Plaintiff's OF-612 and resume on file at all times. Even if one assumes that Plaintiff's OF-612 was crucial and CBP could not move forward without it, twenty months still elapsed after Plaintiff forwarded his OF-612 and resume and not a single job offer was made by CBP to Plaintiff.

78.    CBP did not make a sufficient effort to find Plaintiff a suitable position which he could perform within his medical restrictions. CBP did not properly assess Plaintiff's ability to perform duties in any capacity. It engaged in no interactive process to reasonably accommodate Plaintiff. These were obligations that CBP owed to Plaintiff prior to his removal and Plaintiff did request to be so accommodated, contrary to the MSPB's conclusion. CBP also removed Plaintiff prior to his reaching MMI. CBP did not satisfy its obligations to Plaintiff and removed him in a premature fashion.

79.    The MSPB's conclusion that CBP "attempted to offer [the Plaintiff] a suitable light duty assignment, although the [Plaintiff] failed to cooperate with the agency's RTW process" is totally without any evidentiary support.

80.    CBP, despite the MSPB's observation that it was "very critical" that Plaintiff's position be filled, never replaced Plaintiff in his position, despite its statement that Plaintiff

occupied a very important position.  The fact that Plaintiff's position was not filled, despite its importance, negates any conclusion that Plaintiff's removal promoted the efficiency of the service.

## C.   CBP Directive No. 51810-008

81.     In removing Plaintiff, CBP also violated CBP Directive No. 51810-008, CBP's "Workers' Compensation Program, Return to Work Process : Light Duty and Permanent Reassignment."

82.     CBP violated Section 9.7 of CBP Directive No. 51810-008, which states "The PRT prepares the formal permanent reassignment job offer in compliance with FECA regulations." The letter Plaintiff received was not in compliance with FECA Procedures Manual Section 814.4 and, contrary to the MSPB's conclusion, was not a valid attempt "to find [Plaintiff] a potential position which could be offered, consistent with his medical restrictions."

83.     CBP violated Section 8.5 of the CBP Directive No. 51810-008, which states "The RTW/RN responsibilities include the following: review medical documentation to ensure that it establishes MMI which qualifies an employee for permanent reassignment."  At the time, Plaintiff had not reached MMI.  The Import Specialist position was a permanent reassignment to which Plaintiff could not be placed without MMI.  It was not "a potential light duty assignment, as the MSPB claimed.

84.     CBP violated Section 5.5 of the said Directive, which states:

"ICSs responsibilities include, but are not limited to:

providing case management of injured/ill employees in receipt of OWCP benefits until they are capable of resuming full duties or until a determination is made that they have reached maximum medical improvement (MMI);

-19-

with management's support, taking the lead in returning employees to suitable work as quickly as practicable under this directive;

monitoring cases to ensure that light duty is temporary in nature consistent with the anticipated time frame for the individual's expected full recovery as identified by employee's supporting medical documentation;

where MMI for permanent partial disability has been medically established, referring to the Permanent Reassignment Team (PRT) and assisting in the reassignment processes as need;"

Plaintiff was not capable of resuming full duty and had not reached MMI.

85.  CBP violated Section 5.8 of the said Directive, which states:

The RTW/RN responsibilities include the following:

when requested, provides consultation in complicated cases involved RTW or light duty issues;

reviews medical documentation to ensure that it establishes MMI which qualifies an employee for permanent reassignment;

reviews medical documentation to ensure that medical restrictions are current and clear;

if not, write to issuing physician requesting clarification; and

collaborates with the PRT and Human Resources Operations, Programs, and Policy (HROPP) Division, HRM, to facilitate an employee's permanent reassignment (as specified in the applicable Procedures section of this directive).

CBP did not try to return Plaintiff "to suitable work as quickly as practicable."

86.  CBP violated Section 5.11 of said Directive, which states:

Employees who are sufficiently recovered to perform some type of work must accept offers of suitable light duty.  An employee who has reached MMI must accept offers of suitable permanent reassignment.  Employees must provide all supporting factual (e.g., work experience information, transcripts, etc.) and medical

documentation throughout the RTW and/or permanent reassignment process. They must cooperate in the RTW process and provide information needed to determine eligibility for appropriate positions. Employees must cooperate in the RTW process or may be subject to disciplinary action, up to termination, and/or loss of workers' compensation benefits.

87.     CBP violated Section 6.5 of said Directive, which states:

Partial Disability: Employees who cannot return to the position of record held at the time of a work-related injury, but who are not totally disabled from performing all gainful employment, are considered to be partially disabled. Employees are considered to be temporarily partially disabled until fully recovered and able to return to their position of record or until such time that MMI has been reached, in which case an employee is considered to be permanently disabled.

88.     CBP violated Section 9.12 of said Directive, which states, in reference to the job offer process, "This process may be repeated **as many times as necessary** to place the employee in a medically suitable position." (emphasis added)  CBP hardly made any attempt whatsoever to place Plaintiff in a medically suitable position, since he did not receive one offer, let alone "as many times as necessary."

89.     The MSPB's conclusion that CBP did not violate any of the provisions of said Directive is totally erroneous.

90.     CBP's failure to follow its own directives and policies constituted harmful procedural error.

91.     The MSPB, in concluding that Plaintiff failed to establish his harmful procedural error claim, was also without the required evidence. CBP was under an obligation to wait until Plaintiff reached MMI before removing him. CBP did not engage in any interactive process. Plaintiff never stated that he would not consider a non-law enforcement position.

92.     At the time, Plaintiff had not reached MMI and there was no suitable offer of employment.  CBP totally abdicated its responsibility of making good faith efforts to find Plaintiff suitable employment within his restrictions.  CBP totally failed to engage in any type of interactive process by accommodating Plaintiff into a position that he could perform with his restrictions.

**D.     The Prior EEO Complaints**

93.     Plaintiff's removal also occurred under the background of a hostile work environment that Plaintiff was subjected to after the issues of the beard and video arose.  This hostile work environment resulted in several EEO complaints, which also contributed to CBP's actions herein.

94.     Plaintiff has a long history of EEO activity. This fact was well known to CBP management.  Plaintiff, at the time, had five (5) EEO cases pending.

95.     The issues in Plaintiff's first complaint, Agency Case No. HS-CBP-01519-2013, were:

> Whether Customs and Border Protection discriminated against Complaic, Customs and Border Protection Officer (Program Manager), GS-1895-13, assigned to the Newark Port of Entry (POE), Newark, NJ, based on his race (Hispanic), age (60), disability and reprisal, when:
>
> 1.     On April 30, 2013, his request to restore annual leave was denied;
>
> 2.     On November 8, 2013, he was directed to appear for a Fitness for Duty Examination (FFDE) which subsequently occurred on December 4, 2013; and
>
> 3.     On December 6, 2013, he became aware he did not receive a unit citation that members of his previous unit (Internal Conspiracy Unit) received for work they performed

during the time frame of October 1, 2011 through September 30, 2012.

Plaintiff signed this formal complaint on September 4, 2013.  Plaintiff mentioned DFO Perez

in this complaint.

96.   The second complaint that Plaintiff filed was Agency Case No. HS-CBP-00170-

2015.  The issues were:

> Whether Customs and Border Protection (CBP) discriminated against Complainant, CBP Officer (Program Manager), GS-1895-13, assigned to the Newark Port of Entry, Newark, NJ, and subjected him to harassment based on his race/national origin (Hispanic), age (61), disability, and reprisal (EEO activity), when:
>
> 1.   On September 6, 2014, he received an options letter requiring him to apply for reassignment, resign, retire, or be removed from federal service;
>
> 2.   On September 11, 2014, he requested his unit citation award be mailed to him and to date he has not received it;
>
> 3.   On September 30, 2014, management canceled an award ceremony where Complainant was one of five employees to be recognized; and
>
> 4.   On March 4, 2015, he received a job offer for the position of Import Specialist, GS-1889-11, which is a position two grades lower than his current position.

The date of this complaint was November 19, 2014.

97.   Plaintiff's third complaint, Agency Case No. HS-CBP-24205-2015, was dated July

17, 2015, and the issues were:

> Whether Customs and Border Protection (CBP) discriminated against Complainant, CBP Officer (Program Manager), GS-1895-13, assigned to the Newark Port of Entry, Newark, NJ, and subjected him to a hostile work environment based on his race/national origin (Hispanic), age (December 1952), disability (physical), and reprisal (EEO activity), when:

1.   On May 29, 2015, he discovered that as of May 5, 2015, his Federal Employees Health Benefits (FEHB) Insurance Coverage had been canceled;

2.   On May 22, 2015 and August 22, 2015, he received debt collection letters from the U.S. Department of Agriculture (USDA), National Finance Center (NFC).

3.   On September 14, 2015, he discovered that his Standard Form (SF) 2809, changing his FEHB coverage from a family plan to a single plan had not been filed with the Department of Labor (DOL) (Amended October 22, 2015); and

4.   On September 26, 2015, he became aware that his work assignment had been changed from the Seaport to Passenger Processing at the Newark Airport. (Amended: November 4, 2015).

98.   Plaintiff's fourth complaint, Agency Case No. HS-CBP-26874-2016, was dated September 6, 2016.  Plaintiff's first EEO complaint, after his removal, was on March 29, 2017, when he filed formal EEO complaint HS-CBP-01081-2017, wherein he claimed he became aware on March 3, 2017 that he would not receive his badge and credentials upon his termination for non-disciplinary reasons.  CBP management's justification for its action was: "Chapter 11 of CBP Badge and Credential Policy and Process Guide states in order to receive your badge, you must have retired from the agency.  As [Plaintiff] was removed for an injury and did not retire, he is not entitled to his badge or credentials."  However the very same CBP Badge and Credential Policy and Process Guide Chapter 11.1.7 allowed for Plaintiff to be presented his retired badge as a Honorary Badge Awards.  Plaintiff more than qualifies to receive his retired badge as an honorary award, based on his career long record of accomplishments and faithful service.  This egregious action by CBP demonstrates the level of animus which the agency harbored towards Plaintiff and how the agency was willing to

disregard its own policy and the law, all in an effort to seek retribution against Plaintiff, despite the fact that he was no longer an employee.

99.     DFO Perez, the Deciding Official herein, knew about Plaintiff's protected activity. The Report of Investigation ("ROI") in the EEO matters indicate that the investigator had contacted DFO Perez. In fact, DFO Perez was contacted by EEO Investigator Scott Diem in reference to Plaintiff's first complaint in 2014.  In the course of the investigations, upper management officials were contacted and gave statements about Plaintiff's allegations.

100.     Plaintiff's removal was the culmination of the retaliation that he incurred at the hands of the management officials.

101.     In terminating Plaintiff, CBP treated plaintiff different than other similarly situated employees.

102.     CBP's actions, in removing Plaintiff, did not have any legitimate non-retaliatory basis and any justification that defendant attempts to raise is pretextual.

**E.     Additional Discriminatory and Retaliatory Evidence of Animus**

103.     On December 23, 2015, Mr. Jacobowitz wrote to Ms. Avila and Donna Walker, Injury Compensation Specialist.  He asked, as early as December 2015, that Plaintiff be removed from the rolls. In support thereof, he cited "Previous job offer to return to work (no response from Mr. Pardo.)" This statement, which apparently served as a justification for Plaintiff's removal, was not true.  There was no "previous job offer" and Plaintiff did send his resume and OF-612.

104.     On December 30, 2015, Mr. Jacobowitz instructed Human Resources Specialist Lucia Baez to "Please draft a dismissal letter for [A]PD Fox's signature.  Once received we will

deliver to Mr. Pardo." The fact that CBP had already determined to remove Plaintiff, as early as December 2015, smacks of bad faith. CBP could not have legitimately been attempting to search for a suitable position, when Plaintiff's fate was already preordained.

105.    In a letter dated January 28, 2016 from Ms. Avila to the DOL, Ms. Avila claims "employee was found qualified for a reassignment position and declined the job offer." A second copy of this letter was again sent to the Department of Labor on April 26, 2016. Plaintiff was not medically qualified for this position and he never declined any job offer. CBP never made Plaintiff a legitimate job offer.

106.    CBP made an illegal job offer, despite the fact that the DOL advised CBP, in an August 13, 2013 letter, exactly what would constitute a legitimate job offer. The DOL also informed CBP "We have determined that the weight of the medical evidence in this employee's case rests with Dr. Jeffrey Lakin, who has provided work restrictions as outlined in the attached medical report dated 6/19/2013." In Dr. Lakin's report, he clearly stated that Plaintiff had not reached MMI and the expected date of recovery was undetermined, as he was still undergoing treatment and he gave Plaintiff a weight lifting restriction of 10 pounds. CBP chose to ignore this report and made an illegal job offer which required lifting 20 pounds, more than twice Plaintiff's documented medical restriction.

107.    Plaintiff was evaluated by other physicians, who opined that Plaintiff's restrictions were not compatible with the alleged "job offer." One was Dr. Hammett. Dr. Hammett was a CBP contract physician. Dr. Hammett never spoke with or examined Plaintiff. He did, however, review the medical report of Dr. Baruch and he furnished a report on November 17, 2015. He concluded that the Import Specialist position was **NOT** consistent

with the physical restrictions recommended.  However,  he stated, in his comments, "He is limited to lifting less than or equal to 20 lbs. for short periods of time and the notion of climbing (as in up a ladder) is beyond his described physical capabilities.  **<u>Other than these two limitations, he would be capable of performing the job</u>**." (emphasis added)  The alleged job offer CBP made only mentions a weight restriction of 20 lb.  There is no climbing restriction mentioned.  Dr. Hammett stated that other than the climbing and lifting more than 20 pounds, Plaintiff **<u>would</u>** be capable of doing the job.  Yet, CBP ignored the opinion of its own physician and never offered Plaintiff a job without those two requirements.

108.    In a letter dated May 7, 2015 from CBP to the DOL, CBP claims that it made reasonable efforts to return Plaintiff to work and provided modified duty assignments meeting the medical restrictions.  This is simply not true.  Plaintiff was never offered a position which even came close to meeting his medical restrictions. The letter goes on to state, in boldface type, "I am respectfully requesting that this case is referred to the Vocational and Rehabilitation Program as soon as possible." CBP does not have the authority to decide when a claim should be referred for vocational rehabilitation – that authority rests solely with Department of Labor.  CBP Injury Compensation Specialist Rosie Anderson ends her letter with: "Thanks for your invaluable assistance; please do not hesitate to contact me with any questions or comments." and she provides her phone, fax, and email contact information.

109.    In a multi-page email thread regarding the process of returning Plaintiff to work, Mr. Jacobowitz sent an email to Ms. Walker on March 30, 2015.  The email is partially redacted, but the redaction is not parallel with the text, which exposes a portion of the text which states: "offer him a position but he seems to be stalling the process and not cooperating. What can we

do ??????."  This statement was meant to besmirch Plaintiff's character and was factually incorrect.  Plaintiff complied with every request made by CBP and the DOL.  Plaintiff finds the accusation that he was "stalling the process" particularly infuriating!  It was Plaintiff who became frustrated by his lack of medical progress and petitioned the DOL for second and third opinions, which ultimately lead to Plaintiff being treated at the Hospital for Special Surgery, the number one rated orthopedic hospital.

110.    It was CBP who did nothing to assist Plaintiff with his DOL claim.  CBP routinely had Plaintiff's compensation delayed for months, with one payment being delayed for over two and a half years.  There was a period of over thirteen months where Plaintiff received no compensation, which caused him to lose his health benefits.

111.    At another portion of this said email thread, Mr. Jacobowitz sent an email to Ms. Walker on February 27, 2015 and stated that it did not have Plaintiff's resume.  This comment is a fiction.  In an email dated April 30, 2015, Ms. Walker states "Please see below.  Mr. Pardo's resume.  This resume didn't come from Mr. Pardo, CBP had his resume on file."  This indicates that the whole issue that CBP created of Plaintiff not cooperating in furnishing his resume was untrue.  It had his resume all along.  The resume that Plaintiff mailed in was the same one that was on file.

112.    In a return to work referral cover sheet from Ms. Avila, CBP Injury Compensation Specialist, to the DOL Claims Examiner, Ms. Avila states "IW is not cooperating with local CBP." This was a blatant attempt to portray Plaintiff as a malcontent obstructionist and is not supported by the evidence. In the same email thread, Ms. Avila writes "Upon receipt of DOL's letter rendering a decision and, if the employee is found suitable, then I will generate a full job

offer letter." That never happened.

113.    In a June 30, 2015,10:42 AM email from Program Manager Richard Jacobowitz to CBP Human Resource Specialist Ellen Morse, with the National Finance, Mr. Jacobowitz stated: "It has been challenging as we also have to provide responses to Mr. Pardo's EEO Complaints and law suit along the way."  The fact is that Plaintiff never filed a lawsuit. It was not appropriate for Mr. Jacobowitz to make reference to Plaintiff's EEO complaints at the same time that he is talking about removing him from the rolls.

114.    In an email chain between Mr. Jacobowitz and Ms. Walker, Mr. Jacobson asked Ms. Walker for an updated report from the Department of Labor.  He threatens to go through higher channels if he does not receive it.  In Mr. Jacobowitz' November 16, 2015, 5:28PM email to Ms. Lavan, he states "He did inform me that he will have Donna Walker provide us with Pardo's restrictions from the report so we can look to make an **honest job offer**." (emphasis added)  Mr. Jacobowitz was implying that the previous job offer was not an honest one.

115.    Plaintiff was sent by the DOL, at the urging of CBP, for another IME.  CBP did not even wait for the results of this examination, which was performed on February 15, 2017, before drafting the letter of removal on February 13, 2017 with an effective date of February 17, 2017.

116.    Plaintiff was denied access to his computer files on September 24, 2013.  This was a strategic act by CBP to prevent Plaintiff from having access to relevant evidence and compromised his ability to present his claims.

## Count I

117.    Plaintiff's termination, as affirmed by the MSPB, was arbitrary, capricious,

obtained without compliance with lawful procedures, unsupported by substantial evidence, too severe, discriminatory and retaliatory, and otherwise not in accordance with law.

118.    Pursuant to 5 U.S.C. § 7703 (b)(2), Plaintiff requests that the Court review the MSPB decision and order that it be reversed and that plaintiff be reinstated into his former position as a CBPO (Program Manager) with CBP with all rights, benefits and remedies otherwise due him, including back pay, compensatory damages and that he be restored to the *status quo ante*.

### Count II

119.    Plaintiff alleges that the foregoing actions by Defendant constitute unlawful employment practices because of discrimination and reprisal, in that Defendant undertook the complained of actions because Plaintiff's disabilities and because Plaintiff engaged in the aforementioned protected activity .

120.    By its actions, Defendant treated Plaintiff differently from other employees on account of discrimination and reprisal and discriminated against him in compensation, terms, conditions and privileges of employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, including 42 U.S.C. § 2000e-16, and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*

121.    Defendant cannot demonstrate any legitimate non-discriminatory/non-retaliatory reason for the actions complained of herein; nor can its actions be otherwise justified under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., including 42 U.S.C. § 2000e-16, and  and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* Any alleged non-discriminatory/non-retaliatory reason is nothing more than a pretext so that Defendant could attempt to mask its actions.

122.    By reason of the actions and inactions of Defendant, whereby Defendant engaged in unlawful discriminatory practices based upon discrimination and reprisal, Plaintiff has suffered and continues to suffer economic loss; loss of salary; damage to his career and employment opportunities; damage to his reputation among his peers; embarrassment and humiliation and was otherwise greatly injured.

123.    By reason of the foregoing, Plaintiff has become entitled to appropriate monetary relief, legal fees, and any other appropriate relief as a result of the actions of Defendant.

124.    Plaintiff has also become entitled to an award of compensatory damages and costs and disbursements in an amount to be determined by a jury at trial with appropriate interest.

## **Prayer for Relief**

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendant, on each and every count hereinbefore pled, awarding him appropriate and equitable injunctive relief, compensatory damages, other appropriate damages, attorneys fees, expert fees, and costs and disbursements in an amount to be determined at trial with appropriate interest.

Dated: Jericho, New York
        January 22, 2019                                          WOLIN & WOLIN

                                                                 *Alan E. Wolin*
                                                                 By: Alan E. Wolin, Esq.
                                                                 Attorney for *Plaintiff*
                                                                 420 Jericho Turnpike, Suite 215
                                                                 Jericho, New York 11753
                                                                 Telephone: (516) 938-1199
                                                                 Facsimile: (516) 938-1178
                                                                 E-Mail: wolinlaw@aol.com

## VERIFICATION

State of New York )
)ss.:
County of Nassau )

RAYMOND J. PARDO, being duly sworn, deposes and says:

I am the Plaintiff in the within action and I have read the foregoing Verified Complaint and know the contents thereof, the same is true to my knowledge, except as to those matters therein stated to be based upon information and belief, and as to those matters I believe them to be true.

_Raymond J. Pardo_
RAYMOND J. PARDO

Sworn to before me this
22nd day of January, 2019

_Jill Fieman_
Notary Public

JILL A. FIEMAN
Notary Public, State of New York
No. 4993075
Qualified in Nassau County
Commission Expires 3/9/2022